643 S.E.2d 104

**SOUTH CAROLINA DISTRICT COUNCIL OF ASSEMBLIES OF GOD, Ginger Bruce, Kathy Switzer and Gerald Rollins, Respondents,**

v.

**RIVER OF LIFE INTERNATIONAL WORSHIP CENTER, Sam J. Schneider, Arabella Gaines, Eugene Morvan, Billy Pondexter, Carman Sanders, Tommy Taylor and Kathy Miller, Appellants.**

**No. 4216.**

Court of Appeals of South Carolina.

Heard Jan. 9, 2007.

Decided March 12, 2007.

Rehearing Denied April 19, 2007.

Rolf Mouin Baghdady, of Chapin, for Appellant.

William R. Calhoun, Jr., and William O. Sweeny III, of Columbia, for Respondents.

584

GOOLSBY, J.:

This appeal arises from a declaratory judgment action involving a property dispute between the South Carolina District Council of the Assemblies of God and a local congregation that was formerly affiliated with the General Council of the Assemblies of God. In the appealed order, the trial court ruled (1) real and personal property belonging to River of Life International Worship Center before its attempted disaffiliation became the property of the General Council; and (2) in the alternative, the District Council was entitled to the property. Either way, the trial court held the local congregation, River of Life International Worship Center, is not entitled to the property. River of Life, its minister Sam J. Schneider, and several of its members (collectively "Defendants") appeal. We affirm.

## FACTS

In 1988, Christian Life Assembly, an Assemblies of God congregation, established a mission church as an outreach to the northeast section of Columbia, South Carolina. The mission church, initially named Gihon Christian Assembly of God, initially met in various locations, including a renovated garage, a daycare center, and the Spring Valley theater. In 1994, the mission church, which in 1991 was renamed Northeast Christian Assembly of God, purchased property on which it later built a worship facility. Sometime later, Schneider, who previously served as the minister of an Assemblies of God congregation in Aiken, became minister of Northeast Christian Assembly.[1]

In 1999, Northeast Christian Assembly of God, having formerly been under the supervision of the District Council, successfully applied for affiliation with the General Council of the Assemblies of God.[2] In 2001, Northeast Christian Assem-

---

1. The brief filed by counsel for the respondents states Schneider became minister of Northeast Christian Assembly "[i]n or around 1999"; however, the record contains a mortgage dated May 7, 1997, that Schneider, in his capacity as minister of the church, executed on behalf of the Assembly.

2. According to the Article XI, section 2(a) of the Constitution of the South Carolina District Council of the Assemblies of God, "[g]roups of

bly of God, with the District Council's approval, changed its name to River of Life International Worship Center.

Although Schneider initially supported district-wide activities sponsored and planned by the District Council, his involvement, as well as that by members of River of Life, in these programs began to decline in 2002. On August 11, 2003, Steve Brown, the District Superintendent, wrote to Schneider expressing his concerns about the decreased participation and suggesting the two meet over breakfast. Schneider answered with a letter in which he made statements that caused Brown to question Schneider's loyalty to the Assemblies of God [3] and prompted Brown to send another letter to Schneider. In Brown's second letter, dated August 18, 2003, Brown reminded Schneider of the commitment Schneider made when he applied to become an Assemblies of God minister and advised that a meeting between the two of them was now "mandatory."

In response to Brown's second attempt to arrange a meeting, Schneider sent an undated letter received by the District Council on September 2, 2003, in which he stated he renounced his ties to the Assemblies of God.[4] He further advised the District Council that River of Life would hold a business meeting after the morning service on September 21, 2003, to discuss changes in its bylaws, including a vote by the congregation regarding a proposed change in affiliation. With this letter, a copy of which was sent to the General Council of the Assemblies of God, Schneider enclosed his license as an Assemblies of God minister.

---

Pentecostal believers which are still in the formative stages shall be recognized as District Affiliated Assemblies" and "shall be under the supervision of the District Presbytery which shall serve as trustees thereof." This section further provides that "District Affiliated Assemblies which have matured sufficiently to accept their full share of responsibility for the maintenance of scriptural order, shall be entitled to recognition as autonomous General Council affiliated churches."

3. In this letter, Schneider stated, "I am a Christian through and through and not Assemblies of God. The Assemblies is simply the fellowship where God has placed me."

4. In his second and final letter, Schneider wrote the following: "As a person who entered this fellowship by my own free choice, I also, now leave by that same free choice.... As the apostle Paul said, 'I have finished my course.'"

Before the District Council received this letter, however, Schneider had already met individually with members of the Management Council of River of Life about his intended change in affiliation, consulted a lawyer about whether the congregation could keep the worship facility if they followed him, and announced to the congregation in an "informal business meeting" after the Sunday service on August 31, 2003, that he was leaving the Assemblies of God to join the International Gospel Outreach, a religious organization headquartered in Alabama. During the August 31st meeting, Schneider also assured the congregation that "this building belongs to us. The district had nothing to do with this." The attendees were also advised of the business meeting on September 21, 2003, when the change in River of Life's affiliation would be put to a formal vote.

Brown received a tape recording of the meeting about the same time he received Schneider's letter of resignation. The District Council did not immediately accept Schneider's resignation because it was considering disciplinary proceedings against him and had to follow certain procedural formalities, including consultation with the General Council. Nevertheless, after reviewing the tape and Schneider's second letter, the District Council no longer considered Schneider to be "a credentialed minister in good standing," a condition necessary for River of Life's continued affiliation with the General Council.

After Schneider's announcement on August 31, 2003, numerous present and former parishioners of River of Life sent letters to the local congregation and to the District Council expressing their dismay about River of Life's proposed departure from the Assemblies of God. In all the letters included in the record on appeal, the writers stated they expected their contributions to River of Life would be used to further the purposes of the Assemblies of God. Several of them were pointedly critical about Schneider and the International Gospel Outreach.[5]

Notwithstanding these complaints, the business meeting took place as scheduled on September 21, 2003. The District

---

5. For example, one writer, the plaintiff Kathy A. Switzer, who stated she made tithes and offerings to the church exceeding $42,000, blames

Council did not send a representative even though Schneider, on the tape, indicated he anticipated someone from the District Council would be present and a member of the Management Council, with Schneider's approval, telephoned the District Secretary to invite the District Council officers to the meeting.[6] At the meeting, the congregation voted sixty-three to three to leave the Assemblies of God. Subsequently, the District Council initiated formal disciplinary proceedings against Schneider; and the General Council stripped him of his credentials to serve as a minister in the Assemblies of God.

Since the vote to disaffiliate, the River of Life congregation has continued to occupy and possess the property. On October 15, 2003, the District Council and the three members of the congregation who remained loyal to the Assemblies of God (collectively "Plaintiffs") filed this action in the Richland County Court of Common Pleas for a declaratory judgment regarding the possession and control of River of Life's church property.

The trial court, sitting without a jury, heard the matter on the merits on June 6 and 7, 2005. By order entered August 11, 2005, the trial court granted judgment to Plaintiffs. After Defendants unsuccessfully moved to alter or amend the judgment, they filed this appeal.

## LAW/ANALYSIS[7]

The trial court held, as we noted above, the property did not follow River of Life into the International Gospel Outreach

---

Schneider for the congregation's decision to leave the Assemblies of God.

**6.** Brown did meet with the Management Council on September 8, 2003, out of Schneider's presence. According to the handwritten minutes of that meeting, it appears Brown discussed the procedural formalities that had to be observed concerning Schneider's attempt to resign as an Assemblies of God minister. Brown also expressed his concern about River of Life's low level of participation in District Council events and his sense of betrayal about the attempt to align the congregation with the International Gospel Outreach. He further admonished the Management Council members about abiding by their own bylaws.

**7.** In their brief, Plaintiffs appear to challenge a determination by the trial court early in the litigation that this case was an equitable matter.

denomination. Rather, the trial court held either (1) the General Council of the Assemblies of God, as the "ruling convocation and ecclesiastical head" of an hierarchical organization of which River of Life had been a part before its congregation voted to leave the Assemblies of God, was entitled to the property at issue; or (2) if not the General Council, then under the constitutions and bylaws of both the General Council and the District Council, the District Council assumed ownership of the property upon River of Life's attempt to disaffiliate. We agree with Plaintiffs that these grounds can be viewed as separate and distinct from each other; therefore, our affirmance of either one of them requires our upholding the appealed order [8] because in either case the possession and ownership of the property belongs to an entity other than the River of Life congregation. We therefore address only the trial court's second holding; and based on our review of the record, we conclude the trial court correctly held the District Council was entitled to the property.[9]

In our view, the record supports the trial court's findings of fact irrespective of whether we apply a legal or equitable standard of review in this appeal.

**8.** *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (ruling that, if the determination of a particular issue is dispositive of an appeal, the appellate court need not review the remaining issues); *Weeks v. McMillan*, 291 S.C. 287, 292, 353 S.E.2d 289, 292 (Ct.App.1987) ("Where a decision is based on alternative grounds, either of which independent of the other is sufficient to support it, the decision will not be reversed even if one of the grounds is erroneous.").

**9.** Defendants have also argued that the trial court should have applied a neutral principles analysis to this controversy. To the extent this argument applies to the trial court's determination that River of Life's property had reverted to the District Council upon its attempted secession from the Assemblies of God, we note that "under the 'neutral principles of law' doctrine, if the resolution of a church property dispute requires the interpretation of a religious doctrine as stated in . . . a . . . constitution, then a civil court hearing the case must defer to the authoritative ecclesiastical body's interpretation of that doctrine." 66 Am.Jur.2d *Religious Societies*, § 44, at 462 (2001). Because the dispute in this case required such an interpretation, the trial court properly deferred to the opinions of the officials of the District Council and the General Council about the changes in the status of River of Life and Schneider's status as a credentialed minister in good standing.

The trial court found that, when Schneider surrendered his minister's credentials and announced he was leaving the Assemblies of God, River of Life no longer met the requirements for affiliation with the General Council as set forth in Article XI, section 1(a)(6) of the General Council constitution. Specifically, the trial court cited the mandate within this section that an affiliated local assembly "[m]ake provision for a pastor who is a credentialed minister in good standing with the General Council and a district council." The court also made the unchallenged determination that Brown's testimony that Schneider was not "a credentialed minister in good standing" was "an ecclesial matter" within the domain of the District Council.[10]

█ Defendants dispute the finding that River of Life lost its affiliation with the General Council based on River of Life's failure to have a credentialed minister in good standing, but assert only that Schneider remained in "good standing" when the congregation voted to leave the Assemblies of God because the District Council failed to accept Schneider's resignation when he tendered it. This question, however, of whether Schneider was not "a credentialed minister in good standing with the General Council and a district council" is not one for the court to decide.

█ In any case, it seems to us that the refusal of a governing body of a religious organization to accept a minister's resignation would not preclude a finding by that body that a pastor, particularly one who, like the minister here, left the denomination and joined another, was not "a credentialed minister in good standing" with the denomination. Indeed, we cannot imagine any circumstance under which a pastor who voluntarily departed from one denomination and joined another could remain "a credentialed minister in good standing" with the denomination from which all ties had been severed.[11]

---

**10.** *See Bramlett v. Young,* 229 S.C. 519, 537, 93 S.E.2d 873, 882 (1956) (noting "civil courts have no jurisdiction of ecclesiastical questions and controversies").

**11.** Defendants contend Plaintiffs are estopped to argue that the local affiliated assembly was without a minister because the District Council never accepted Schneider's resignation. At best, this argument is conclusory in that it consists of only two sentences in their brief, cites

■ Based on its determination that River of Life lost its affiliation with the General Council because it no longer had "a credentialed minister in good standing" with the Assemblies of God, the trial court proceeded to find the status of River of Life became that of a district-affiliated church by operation of Article VI, Section 5 of the General Council's Bylaws, a bylaw that spells out the guidelines for minimal membership for General Council affiliated assemblies. We agree with this holding.

Article VI, Section 5 provides in pertinent part that "[i]f the minimal requirements [for affiliation of a local church with the General Council] have not been attained, the church *shall* revert to district affiliated status until the minimal requirements for General Council affiliation have been attained." (Emphasis added.) In addition, as the trial court noted, although this section previously required a one-year waiting period before the local assembly would revert to district-affiliated status, the General Council amended the provision in 2003 to allow the reversion to be immediate.[12]

■ Based on this provision, as amended, and the absence of "a credentialed minister in good standing" with the General Council, we hold the trial court correctly found River of Life had reverted to district-affiliated status and, pursuant to Article VII, section 1(b) of the bylaws of the South Carolina District Council, was thus required to "conduct all its business

---

no legal authority whatsoever, and says nothing about how the District Council's failure to accept Schneider's resignation caused Defendants to change position to their detriment. *See American Sur. Co. v. Hamrick Mills,* 191 S.C. 362, 373, 4 S.E.2d 308, 313 (1939) (listing the essential elements of estoppel, among them being that the party invoking the doctrine suffered a prejudicial change of position). We therefore do not address the argument. *See First Sav. Bank v. McLean,* 314 S.C. 361, 363, 444 S.E.2d 513, 514 (1994) (deeming an issue abandoned because the appellant failed to "provide arguments or supporting authority for his assertion"). In any event, the focus was not whether River of Life had "a minister" but whether its minister was "a credentialed minister in good standing."

12. Defendants contend in a somewhat conclusory fashion that a reversion did not instantaneously flow from a failure of a church to meet minimal requirements. The plain and unambiguous language of the bylaw, however, undermines that argument. Nowhere does the amended bylaw prescribe an amount of time that must pass before a reversion can occur.

in accordance with the Constitution and Bylaws for District Affiliated Assemblies as provided by the South Carolina District Council." [13]

 The trial court then determined that, because River of Life had become a district-affiliated church, the District Council was entitled to its assets upon the congregation's decision to leave the Assemblies of God. In support of its finding, the trial court cited Article XI, section 1(b) of the Constitution and Bylaws for District Affiliated Assemblies in Affiliation with the South Carolina District Council of the Assemblies of God,[14] which provides as follows:

In the event this local assembly should at any time cease to function as an Assemblies of God church under the jurisdic-

13. In their brief, Defendants asserted the maxim "equity aids the vigilant" in support of their contention that the District Council's failure to attend the September 21, 2003 meeting and to take other measures to dissuade River of Life's parishioners from voting to leave the Assemblies of God barred Plaintiffs from using the changes in River of Life's status to support the District Council's claim to the church property. This argument lacks merit. Defendants failed to explain how the District Council's alleged inaction inured to their prejudice. Cf. Harvey v. Art Metal, Inc., 247 S.C. 443, 449, 147 S.E.2d 697, 701 (1966) ("[A]n essential element of the defense of equitable estoppel is material prejudice to the party asserting the defense resulting from the act or neglect of the party against whom it is asserted.").

14. During oral argument and in reply to Plaintiffs' argument, Defendants argued for the first time to this court that Article XI was included only in a draft or proposed document and had never been adopted. The Plaintiffs, on the other hand, in a post-hearing memorandum, designated this document as one of several that does indeed control the result here, thereby suggesting it had been adopted. Although counsel for Defendants stated he objected to the document, we found nothing in the voluminous, often confusing, record presented to this court that corroborates his assertion that an objection was made. Assuming without deciding Defendants raised this issue at trial, the trial court never addressed it in the appealed order, and Defendants failed to raise it in their motion to alter or amend. Also, Defendants do not list the issue as among the Statement of Issues on Appeal. See Rule 208(b)(1)(B), SCACR ("Ordinarily, no point will be considered which is not set forth in the statement of issues on appeal."); Noisette v. Ismail, 304 S.C. 56, 58, 403 S.E.2d 122, 124 (1991) (holding that, when the trial court does not explicitly rule on an issue at trial and the appellant fails to move to alter or amend the judgment on that ground, the issue is not properly before appellate court and should not be addressed).

tion of the South Carolina District Council of the Assemblies of God, ... then the tangible property belonging to said church, real or personal, and all the interest of said church, real or equitable, in any and all property shall be and thereupon become the property of the South Carolina District of the Assemblies of God. . . .

We agree with the trial court that the District Council is entitled to the disputed property. Under the above-quoted provisions, when the congregation voted to disaffiliate from the Assemblies of God, River of Life "cease[d] to function as an Assemblies of God church under the jurisdiction of the District Council" and the church property "thereupon [became] the property of the South Carolina District of the Assemblies of God." [15]

**AFFIRMED.**

STILWELL and SHORT, JJ., concur.

---

**15.** We do not overlook the rights provided in Article XI, section 1(c), of the constitution of the General Council of the Assemblies of God, including "the right to acquire and hold title to property, either through trustees or its corporate name as a self-governing unit." This provision, however, does not override other relevant provisions in the constitution of the General Council or those included in other governing documents of the General Council or the District Council. *Cf. State v. Prince*, 335 S.C. 466, 472, 517 S.E.2d 229, 232 (Ct.App.1999) ("[T]he court should not consider the particular clause being construed in isolation, but should read it in conjunction with the purpose of the whole statute and the policy of the law.") (citing *South Carolina Coastal Council v. South Carolina State Ethics Comm'n*, 306 S.C. 41, 44, 410 S.E.2d 245, 247 (1991)). Here, the rights at issue are granted only to "each *General Council affiliated assembly*." (Emphasis added.) When Schneider severed his ties with the Assemblies of God, River of Life was no longer affiliated with the General Council and, consequently, lacked the requisite status to exercise the rights of self-government.